**ARKANSAS–BEST FREIGHT SYSTEMS, INC., Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and the Secretary of Labor, Respondents.**

**No. 75–1249.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1975.

Decided Jan. 29, 1976.

S. Walton Maurras, Harper, Young & Smith, Fort Smith, Ark., for petitioner.

Marc R. Hillson, Atty., U. S. Dept. of Labor, Washington, D. C., for Secretary of Labor.

Before HEANEY, WEBSTER and HENLEY, Circuit Judges.

HEANEY, Circuit Judge.

Arkansas-Best Freight System, Inc., appeals from a final order of the Occupational Safety and Health Review Commission finding it guilty of a non-serious violation of an occupational safety standard promulgated by the Secretary of Labor pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, and upholding a penalty of thirty dollars for that violation. We affirm.

Arkansas-Best, an interstate motor freight common carrier, operates fifty-

two terminals in nineteen states. On January 31, 1973, a representative of the Secretary of Labor inspected the company's Fletcher, North Carolina, freight terminal and maintenance shop. Following the inspection, Arkansas-Best was cited for an alleged failure to comply with an occupational safety standard relating to the wearing of protective equipment.[1] *See* 29 U.S.C. § 654(a)(2). The violation alleged was the failure of Arkansas-Best to require its employees who worked in heavy material handling areas, namely the freight dock and the maintenance shop, to wear safety-toe footwear. The standard promulgated by the Secretary of Labor, pursuant to 29 U.S.C. § 655, provides:

> Protective equipment, including personal protective equipment for * * * extremities, protective clothing * * * shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment * * * or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through * * * physical contact.

29 C.F.R. § 1910.132(a).

Arkansas-Best contested the citation. It asked for and received a hearing pursuant to 29 U.S.C. § 659. The hearing officer found no violation. He reasoned that the existence of "hazards of processes or environment" at the terminal necessitating the use of safety-toe footwear had been negated because there were only four toe injuries over a

four-year period involving more than 500,000 man hours of work. He indicated in dicta that the standard was vague and ambiguous.

The Occupational Safety and Health Review Commission directed that the hearing examiner's decision be reviewed pursuant to 29 U.S.C. § 661(i). The Commission did so and held that: (1) the standard was not unconstitutionally vague;[2] (2) the standard required the freight dock and maintenance shop employees of Arkansas-Best to wear safety-toe footwear; and (3) it had no power to decide whether the standard is one that can properly be promulgated by the Secretary consistent with the Act.

### I

Arkansas-Best appeals the decision of the Commission. It initially contends that the standard cannot be applied because compliance would be more economically burdensome to interstate commerce than would the costs flowing from tow injuries.[3] It relies on 29 U.S.C. § 651(a) to support its argument. That section provides:

> The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments.

### A.

 The Act does not specifically provide for judicial review of the standards

---

1. The original citation alleged five violations of the Act. It was later amended to eliminate one of the allegations. Of the four alleged violations, three were not contested by Arkansas-Best and only the fourth is at issue here.

2. The Chairman of the Commission dissented from the majority opinion on the grounds that the standard was unconstitutionally vague because it did not afford reasonable notice and was not set forth in clear language, uncolored by subjective criteria. The vagueness argument is not raised by Arkansas-Best on appeal and has been rejected in substantially similar

factual situations in *Ryder Truck Lines, Inc. v. Brennan*, 497 F.2d 230 (5th Cir. 1974), and *McLean Trucking Co. v. Occupational Safety & H. R. Com'n*, 503 F.2d 8 (4th Cir. 1974).

3. Arkansas-Best did not seek pre-enforcement review of the standard, 29 U.S.C. § 655(f), it has not applied for a variance from the standard, 29 U.S.C. § 655(d), and it has not sought an amendment of the standard, 29 U.S.C. § 655(b). *See Lee Way Motor Freight, Inc.*, OSHRC Docket No. 1105 (April 23, 1974), 1973–1974 CCH OSHD ¶ 17,693, *aff'd*, 511 F.2d 864 (10th Cir. 1975).

promulgated by the Secretary in enforcement proceedings.[4] It is clear from the legislative history, however, that judicial review during the enforcement stage is intended. *See* Senate Report No. 91–1282, 1970 U.S.Code Cong. & Admin.News p. 5184. *See Brennan v. Occupational Safety & Health Rev. Com'n,* 505 F.2d 869 (10th Cir. 1974); *Ryder Truck Lines, Inc. v. Brennan,* 497 F.2d 230 (5th Cir. 1974). Moreover, such review is consistent with the rule that judicial review is to be presumed. *See Ratnayake v. Mack,* 499 F.2d 1207, 1209–1210 (8th Cir. 1974).

■ We review the issue of whether the standard is one that can properly be promulgated by the Secretary consistent with the Act under the arbitrary and capricious test rather than the substantial evidence test that applies in pre-enforcement review under 29 U.S.C. § 655(f).[5] We do this because the issue presents primarily questions of legislative policy that have been delegated to the Secretary under the Act. As stated in *Industrial Union Department, AFL–CIO v. Hodgson,* 162 U.S.App.D.C. 331, 499 F.2d 467, 474 (1974):

OSHA sets forth general policy objectives and establishes the basic procedural framework for the promulgation of standards, but the formulation of specific substantive provisions is left largely to the Secretary. The Secretary's task thus contains "elements of both a legislative policy determination and an adjudicative resolution of disputed facts." * * * Although in practice these elements may so intertwine as to be virtually inseparable, they are conceptually distinct and can only be regarded as such by a reviewing court. (Citation and footnotes omitted.)

*See Brennan v. Occupational Safety & Health Review Com'n,* 502 F.2d 946, 951 (3rd Cir. 1974); *Brennan v. Occupational Safety & Health Review Com'n,* 487 F.2d 438, 442 (8th Cir. 1973); 5 U.S.C. § 706(2)(A).

### B.

■ In our view, the standard is within the legislative grant of power. It represents a determination of legislative policy delegated to the Secretary that is neither arbitrary nor capricious. The purpose of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources". 29 U.S.C. § 651(b). The Act is intended to prevent the first injury, including those of a non-serious nature. *See Lee Way Motor Freight, Inc. v. Secretary of Labor,* 511 F.2d 864, 870 (10th Cir. 1975); *Brennan v. Occupational Safety & Health Rev. Com'n,* 513 F.2d 1032, 1039 (2nd Cir. 1975); *Ryder Truck Lines, Inc. v. Brennan, supra* at 233; *Brennan v. Occupational Safety & Health Review Com'n,* 494 F.2d 460, 463 (8th Cir. 1974). The legislative decision has been made to protect the health of employees even though increased production costs may result. *Industrial Union Department, AFL–CIO v. Hodgson, su-*

4. The Act provides that on review from an order of the Commission "the court shall have jurisdiction of the proceeding and of the question determined therein". 29 U.S.C. § 660(a). The Commission expressly declined to rule on the validity of the standard under the Act, stating that it had no power to review the rulemaking functions of the Secretary and citing *U. S. Steel Corp.,* OSHRC Docket Nos. 2975, 4349 (November 14, 1974), 1974–1975 CCH OSHD ¶ 19,047 (concurring opinion), in support of its position.

5. Judge Friendly has questioned whether, in the context of the notice and comment rulemaking under the Act, the distinction between the substantial evidence test and the arbitrary and capricious test is of dispositional significance. He said:

While we still have a feeling that there may be cases where an adjudicative determination not supported by substantial evidence * * * would not be regarded as arbitrary or capricious, * * * in the review of rules of general applicability made after notice and comment rulemaking, the two criteria do tend to converge. (Citations and footnotes omitted).

*Associated Indus. of N.Y.S., Inc. v. United States Dept. of L.,* 487 F.2d 342, 350 (2nd Cir. 1973).

*pra* at 477. The Act does not attempt to balance as neatly as does Arkansas-Best the cost of compliance against the cost of employees' injuries. This is not to say that economic considerations are irrelevant under the Act. The statement of purpose embodied in 29 U.S.C. § 651(b) is qualified by the words "so far as possible". Moreover, the legislative history makes clear that the standards promulgated by the Secretary must be feasible. Senate Report No. 91–1282, 1970 U.S. Code Cong. & Admin.News p. 5183. *See Industrial Union Department, AFL–CIO v. Hodgson, supra* at 477–478; *National Rlty. & C. Co., Inc. v. Occupational S. & H. R. Com'n*, 160 U.S.App.D.C. 133, 489 F.2d 1257–1266 (1973).

■ Arkansas-Best does not, however, challenge the standard as it applies to all affected employers but only as it applies to it.[6] It asks this Court to judicially grant it an exemption from compliance. Assuming, without deciding, that we have this power, we are not convinced from this record that compliance with the standard is not feasible by Arkansas-Best. The company has had a history of growth that is expected to continue. Its revenues in 1969 were $44 million and in 1972, $66 million. Its estimate of the initial cost of compliance is $167,825, and its estimate of the annual cost of compliance is $49,823. It produced no evidence

indicating that it would be unable to absorb these costs or to include them as a necessary expense in an appropriate rate-making procedure.[7]

## II

■ Arkansas-Best also argues that the Commission's order and decision cannot be upheld because there is insufficient proof to support the findings that: (1) the working conditions were hazardous; (2) it had knowledge of the hazardous condition; and (3) its employees were exposed to such a condition. Our review of the Commission's findings of fact is governed by the substantial evidence test. *Beall Const. Co. v. Occupational Safety & H. Rev. Com'n*, 507 F.2d 1041, 1046 (8th Cir. 1974); 29 U.S.C. § 660(a).

■ Contrary to the decision of the hearing examiner and the contention of Arkansas-Best, factual proof of an actual hazard is unnecessary to show noncompliance. The Act is directed at prevention, and the standard itself assumes the existence of a hazard.[8] *Lee Way Motor Freight, Inc. v. Secretary of Labor, supra* at 867, 869.

■ But while it is unnecessary to show that an employee is in immediate peril of injury, the determination of the

6. *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 478 (1974), states:

Standards may be economically feasible even though, from the standpoint of employers, they are financially burdensome and affect profit margins adversely. Nor does the concept of economic feasibility necessarily guarantee the continued existence of individual employers. It would appear to be consistent with the purposes of the Act to envisage the economic demise of an employer who has lagged behind the rest of the industry in protecting the health and safety of employees and is consequently financially unable to comply with new standards as quickly as other employers. * * * (Footnote omitted.)

7. The thrust of Arkansas-Best's economic argument is mitigated by its erroneous interpretation of the standard. It focuses upon the

words "shall be provided, used, and maintained in a sanitary and reliable condition" and concludes that it must provide and keep sanitary the safety-toe footwear. Its cost figures reflect the cost of providing each employee with two pair of safety-toe shoes, the cost of supervising their rotation, and the cost of providing storage space and security for them. Arkansas-Best's interpretation of its duty under 29 C.F.R. § 1910.132(a) is not shared by the Commission or the Secretary. *See Budd Co. v. Occupational Safety & Health Rev. Com'n*, 513 F.2d 201 (3rd Cir. 1975) (per curiam).

8. If noncompliance presents no direct or immediate relationship to the safety of the employees, the violation is de minimus and the Secretary may issue only a notice, not a citation. *Lee Way Motor Freight, Inc. v. Secretary of Labor*, 511 F.2d 864, 869 (10th Cir. 1975); 29 U.S.C. § 658(a).

standard's applicability is not without difficulty for it turns on the phrase "hazards of processes or environment". We believe the phrase must be read in the light of the objective test of foreseeability. As stated in *Brennan v. Occupational Safety & Health Rev. Com'n, supra* at 873 (review of 29 C.F.R. § 1910.-151(b)):

> The standard furthers the intent of the Act by recognizing "a common social duty," * * * governed by the "reasonable man" concept. (Citation omitted.)

This requirement of foreseeability, whether a reasonable man would recognize a danger warranting the use of safety-toe footwear, has also been applied in construing the standard at issue here. *Ryder Truck Lines, Inc. v. Brennan, supra* at 233. *See Cape & Vineyard Div. v. Occupational S. & H. Rev. Com'n,* 512 F.2d 1148, 1152 (1st Cir. 1975).[9]

■■■ The record shows that all types of freight were loaded and unloaded upon the truck trailers by the freight dock employees of the Fletcher terminal. Some of the freight was moved by hand and some by mechanized equipment. The dock had over forty-five parking spaces for the trucks, and the site was the scene of considerable activity. The terminal handled 179 million tons of freight in 1972, and had a daily rate for that year of 700,000 pounds. The employees' work included the moving of heavy materials. The maintenance shop employees, who maintain and service the truck and trailers, were required to work with and carry heavy parts and tools, align brakes and change tires that ranged from forty to forty-eight inches in height. Further, while the presence of past injuries is unnecessary for a finding of noncompliance, *Lee Way Motor Freight, Inc. v. Secretary of Labor, supra* at 870; *Brennan v. Occupational Safety & Health Rev. Com'n, supra* at 1039; *Ryder Truck Lines, Inc. v. Brennan, supra* at 233, the Commission found that, in 1970, two toe injuries were recorded at the Fletcher terminal, one involving a freight dock employee and the other a maintenance shop employee. It also found that, in 1972, two toe injuries were recorded for maintenance shop employees.[10] In the light of this record, the conclusion of the Commission that toe injuries were foreseeable because of the constant material handling by the freight dock and maintenance shop employees is supported by substantial evidence on the record as a whole.

■■■ The contention of Arkansas-Best that the proof is insufficient to show its knowledge of the fact that the conditions were hazardous is rejected. The applicability of a standard is determined by the objective test of foreseeability and not the subjective knowledge of the employer. *See REA Express, Inc. v. Brennan,* 495 F.2d 822, 826 (2nd Cir. 1974).[11]

■■ Finally, we reject Arkansas-Best's contention that the employees were not exposed to the hazardous condition. It was stipulated at the hearing below that on the date of inspection no

9. Proof of an injury and the fact that it could have been prevented does not necessarily prove that it was foreseeable. *See Cape & Vineyard Div. v. Occupational S. & H. Rev. Com'n,* 512 F.2d 1148, 1152–1153 (1st Cir. 1975).

10. In 1972, Arkansas-Best employed thirty freight dockmen and thirty-two maintenance shop employees. Included within the class of freight dockmen were employees who also functioned as city drivers. About fifty percent of the work time of a city driver was spent as a freight dockman.

 The record also shows that company-wide, Arkansas-Best employees suffered twenty-two toe injuries in 1969, twenty in 1970, fifteen in 1971, and twenty-three in 1972. The majority of these injuries involved freight dockmen and city drivers but some also involved maintenance shop employees.

11. Separate from the issue of employer knowledge of the hazard, this Circuit has said that an employer may be guilty of a non-serious violation of the Act even though it is unaware of its occurrence. *Brennan· v. Occupational Safety & Health Review Com'n,* 487 F.2d 438, 442 n.19 (8th Cir. 1973). *Contra, Brennan v. Occupational Safety & Health Rev. Com'n,* 511 F.2d 1139, 1144 (9th Cir. 1975).

safety shoes were found in use, and that the appellant neither provided nor required its employees to wear them. This, in conjunction with the finding that the employees were engaged in constant material handling, some of which was heavy, is sufficient to support the Commission's order and decision.

██ The proposed penalty of thirty dollars was upheld by the Commission after considering the size of Arkansas-Best's operation, its history of no prior violations, its good faith and the gravity of the violation. It did not abuse its discretion. *See Beall Const. Co. v. Occupational Safety & H. Rev. Com'n, supra* at 1046; *Brennan v. Occupational Safety & Health Review Com'n, supra* at 442; 29 U.S.C. § 666(c).

 We recognize that a case can be made for developing a specific safety-toe footwear standard by regulation. As the Supreme Court noted in *Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947):

> Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon *ad hoc* adjudication to formulate new standards of conduct * * *. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future.

The choice between *ad hoc* litigation and proceeding by regulation is normally within the informed discretion of the Secretary. *Id.* at 203, 67 S.Ct. 1575. We are not prepared to say, on the basis of this record, that the Secretary has abused this discretion. We note only that the requirements with respect to safety-toe footwear in the trucking industry may have developed to the stage where they can be prescribed by specific regulation.[12]

The petition to set aside the order of the Commission is denied.

---

12. The legislative history states:

> Insofar as practicable, standards are to be expressed in terms of objective criteria and the performance desired.